*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 23, 2024

Plaintiff-Appellee,

v

No. 363001
Calhoun Circuit Court

TYRONE KENNEDY,

LC No. 1987-002560-FC

Defendant-Appellant.

Before: JANSEN, P.J., and MURRAY and O'BRIEN, JJ.

PER CURIAM.

Defendant, Tyrone Kennedy, appeals by delayed leave granted[1] the trial court's April 4, 2022 order denying his motion for relief from judgment on the basis of newly discovered evidence. In an earlier April 9, 2021 order, the trial court denied defendant's motion for relief from judgment to the extent that defendant argued that his trial and appellate counsel were ineffective and that the prosecution withheld evidence in violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). As set forth below, this Court does not have jurisdiction over the April 9, 2021 order, and the trial court did not abuse its discretion by denying defendant's motion for relief from judgment on the basis of newly discovered evidence. We accordingly affirm.

## I. BACKGROUND

In May 1988, defendant was convicted by a jury of armed robbery, MCL 750.529; assault with intent to commit murder, MCL 750.83; and breaking and entering an occupied dwelling, MCL 750.110. Defendant's convictions arose out of the attack and robbery of 81-year-old Elsie Watson at her home in Albion, Michigan, on the evening of September 4, 1987. Watson was severely beaten with a brick in her upstairs bedroom, and her large black purse was stolen.

---

[1] *People v Kennedy*, unpublished order of the Court of Appeals, entered April 4, 2023 (Docket No. 363991).

-1-

Watson lived on Linden Avenue, which runs parallel to South Monroe Street, separated by a millrace (a small river). Erie Street runs roughly perpendicular to Linden and South Monroe, and connects the two streets. East Porter Street runs parallel to Erie Street, and South Monroe connects the two. The portion of South Monroe that connects East Porter and Erie is a narrow one-way street. In September 1987, there was a streetlight on the corner of Erie and South Monroe, and the house on the corner of South Monroe and Erie had a bright garage light that threw light on South Monroe. There was a similar light on a garage on a home across the millrace from South Monroe on Linden. There was also a streetlight on Linden across the millrace, and a third streetlight where South Monroe intersects with East Porter. There were additional lights at the corner of South Monroe and East Porter at an apartment complex.

Hazel Vandevender lived on South Monroe between Erie and East Porter. On the night that Watson was attacked, Vandevender was at home babysitting for her neighbor, who was supposed to be home around 11:00 p.m. Vandevender was waiting on her porch around that time watching for her neighbor. While she was waiting, she saw a man walk down Erie over the millrace and turn down South Monroe. Vandevender took interest in the man because he was carrying a large purse under his arm. She watched the man as he walked down South Monroe directly in front of her house. Vandevender recognized the man because she had seen him walking around the neighborhood before.[2] Vandevender watched as the man went to the sidewalk on the corner of South Monroe and East Porter, dumped the contents of the purse on the sidewalk, and placed something in his pocket. The man put the rest of the contents back in the purse, walked to the middle of South Monroe, and threw the purse in the millrace. Vandevender watched as the purse "flipped and everything went down in the water." She yelled at the man after he threw the purse, and he ran down East Porter.

Vandevender immediately called her neighbors, Carolyn and Walter Swyers, who lived on the corner of South Monroe and East Porter. After getting Vandevender's call, Carolyn called the police, and Walter stepped outside and saw a man crossing the street two blocks away. When the police arrived, Vandevender told the officers that she recognized the man as someone she had seen walking around the neighborhood. One of the officers, Douglas Rogers, knew defendant and had seen him walking around the area near Vandevender's home. Vandevender later identified defendant in a lineup.

James "Bud" Leslie Howard, defendant's friend, made a written statement on October 10, 1987, in which he said that, while he was driving with defendant, defendant admitted to being involved in the assault of Watson. According to Howard's statement to police, Howard told defendant that he had heard that defendant was involved in the incident. Defendant then told Howard that he was drunk and needed money to pay some debts when he ran into Curtis "Jake" Wilson, who also needed money. Wilson told defendant that he knew where to get some money, and defendant and Wilson went to Watson's house to steal from her. According to Howard's statement, defendant "was drunk and lost control of himself and was afraid [Watson] would

---

[2] Vandevender said that she often sat on her porch taking note of people walking in the neighborhood because she and another individual were trying to start a neighborhood watch.

identify him in a line-up." Defendant told Howard that he took Watson's purse and left, later "toss[ing]" the purse.

Howard admitted during cross-examination that he was intoxicated when defendant told him this story, and he acknowledged it was possible that defendant admitted there were rumors about his involvement in the attack of Watson but denied involvement. Howard also acknowledged that he was drunk when he spoke to police, and admitted that he blacked out at times from drinking. Howard also admitted that, after defendant was arrested, Howard sent letters to defendant while he was in jail in which Howard expressed his belief that defendant was not involved with the crime.

The Michigan Innocence Clinic became involved in defendant's case in 2014. Pertinent to this appeal, defendant moved for relief from judgment based on claims of ineffective assistance of counsel, an alleged *Brady* violation, and newly discovered evidence. In an April 9, 2021 order, the trial court dismissed defendant's claims that he received ineffective assistance of counsel and that a note discovered in the prosecution's file violated *Brady*. But the court concluded that an evidentiary hearing was necessary to address "(1) whether newly discovered scientific evidence related to eye witness reliability would create a reasonable probability of a different outcome upon retrial, and (2) whether the newly discovered witnesses who provided affidavits are credible and if so, would their testimony create a reasonable probability of a different outcome upon retrial." After a two-day evidentiary hearing, the trial court denied defendant's motion for relief from judgment based on the newly discovered evidence in an April 4, 2022 order. This appeal followed.

## II. JURISDICTION

Defendant filed an application for leave to appeal the trial court's April 9, 2021 order denying his motion for relief from judgment based on ineffective assistance and *Brady* claims, as well as the trial court's April 4, 2022 order denying his motion for relief from judgment based on newly discovered evidence. In a September 27, 2022 order, this Court dismissed in part for lack of jurisdiction defendant's application to the extent that it sought to appeal the April 9, 2021 order.[3] Defendant appealed this partial dismissal to the Michigan Supreme Court, which denied the appeal. *People v Kennedy*, ___ Mich ___; 985 NW2d 833 (2023). In a concurring statement, Justice CAVANAGH said that she was "not entirely persuaded that the Court of Appeals properly dismissed in part defendant's application for lack of jurisdiction" but recognized that the court rules did not clearly speak on the issue. *Id*. at 833-834. Justice CAVANAGH went on to say:

> I write to emphasize that in resolving this defendant's appeal, the Court of Appeals should consider all the claims raised in defendant's motion for relief from judgment as necessary for reviewing the order before it. Specifically, defendant argued in the trial court that he was entitled to relief from judgment based on (1) a *Brady* violation, (2) ineffective assistance of counsel, and (3) newly discovered evidence. While only the order addressing defendant's claim of newly discovered evidence is currently before the Court of Appeals, defendant's other claims may be

---

[3] *People v Kennedy*, unpublished order of the Court of Appeals, entered September 27, 2022 (Docket No. 363991).

-3-

relevant to what evidence "would be admitted at retrial" and therefore whether the alleged newly discovered evidence entitles defendant to relief from judgment. *People v Johnson*, 502 Mich 541, 571 (2018) (emphasis omitted); see also MCR 6.508(D)(2). [*Kennedy*, 985 NW2d at 834 (footnote omitted).]

This Court subsequently granted defendant's application for leave to appeal "limited to the issues raised in the application and supporting brief."[4]

Based on the foregoing, this panel's jurisdiction is plainly limited to reviewing defendant's appeal to the extent that it contests the rulings made by the trial court in its April 4, 2022 order, meaning we can only review the lower court's denial of defendant's motion for relief from judgment based on newly discovered evidence. While attempting to avoid this conclusion, defendant's statements on appeal reinforce it. He repeatedly says that the trial court dismissed defendant's ineffective assistance and *Brady* claims in the April 9, 2021 order. He also repeatedly says that the trial court's April 4, 2022 opinion "only addressed" defendant's motion for relief from judgment based on newly discovered evidence claim because the court "denied the *Brady* and [ineffective assistance] claims before the hearing." Defendant thus acknowledges that the trial court resolved his motion for relief from judgment based on ineffective assistance of counsel and an alleged *Brady* violation in the April 9, 2021 order, and that the April 4, 2022 order resolved only defendant's motion for relief from judgment based on newly discovered evidence. Because this Court only has jurisdiction over the April 4, 2022 order, and because that order "only addressed" defendant's motion for relief from judgment based on newly discovered evidence, this Court is limited to reviewing the trial court's denial of defendant's motion for relief from judgment based on newly discovered evidence.

Defendant insists that this conclusion "runs afoul" of "the guidance in" Justice CAVANAGH's concurring statement. That statement, defendant emphasizes, said that this Court "should consider all the claims raised in defendant's motion for relief from judgment . . . ." *Kennedy*, 985 NW2d at 834. This excerpt is misleading. The full sentence reads, "I write to emphasize that in resolving this defendant's appeal, the Court of Appeals should consider all the claims raised in defendant's motion for relief from judgment *as necessary for reviewing the order before it*." *Id*. (emphasis added). The order before this Court is the April 4, 2022 order that addressed defendant's motion for relief from judgment based on newly discovered evidence. This is consistent with Justice CAVANAGH's apparent understanding of the case—her statement later says that "only the order addressing defendant's claim of newly discovered evidence is currently before the Court of Appeals . . . ." *Id*.

Still resisting this conclusion, defendant contends that this Court's April 4, 2023 order gives this Court jurisdiction to address his ineffective assistance and *Brady* claims because the order granted defendant's application "limited to the issues raised in the application and supporting brief." But that order was entered after the September 27, 2022 order in which this Court dismissed defendant's application to the extent it sought to appeal the April 9, 2021 order. Following that order, the only issue left in defendant's application related to defendant's motion for relief from

---

[4] *Kennedy*, unpub order, entered April 4, 2023.

judgment based on newly discovered evidence. The ensuing April 4, 2023 order could only grant leave on that issue, which it did.

That said, this Court will consider defendant's ineffective assistance and *Brady* claims to the extent that they are relevant to assessing whether defendant's newly discovered evidence entitles him to relief from judgment, as thoughtfully suggested by Justice CAVANAGH.

## III. NEWLY DISCOVERED EVIDENCE

Defendant's motion for relief from judgment based on newly discovered evidence principally relied on (1) witness affidavits claiming that Wilson confessed to committing the crime for which defendant was convicted and (2) new scientific evidence related to eyewitness identification that was not available at the time of defendant's trial in 1988. As stated above, the trial court held a two-day evidentiary hearing at which it received defendant's evidence supporting his motion.

## A. WILSON'S CONFESSION

Rechelle Etchison testified at the evidentiary hearing that she knew Wilson and defendant from school. While her testimony is unclear, it appears that she dated Wilson at some point after defendant's trial. Etchison testified that Wilson told her that defendant was not involved in the robbery and assault of Watson, and that Wilson and another unidentified individual were the ones that broke into Watson's home and hit her in the head with a brick.

Etchison admitted that she and Wilson were "drinking beers and doing things we ain't supposed to do" when Wilson confessed to her. Nevertheless, according to Etchison, "we weren't like in a state of fog or nothing like that. It was like you know, it—it got serious when he told me." She denied that she was misremembering what Wilson had told her. She added that his confession was "burnt in my brain."

Etchison said that she contacted defendant's sister the next day, which was sometime between 2001 and 2004, and informed her of Wilson's confession. Eventually, the Michigan Innocence Clinic contacted her about the confession. According to Etchison, she came forward and agreed to testify because she

> felt sad. I was hurt and it was wrong. And the truth need [sic] to come out. So, that's why I called his sister because I knew she was going to handle it. So, that's why I told her.

## B. NEW SCIENTIFIC EVIDENCE

Jonathan Kagan-Kans testified at the evidentiary hearing that he worked on this case beginning in September 2019 when he was participating as a student in the Michigan Innocence Clinic. Kagan-Kans said that in early October 2019, he visited Vandevender's former home where she had identified defendant. During Vandevender's testimony at defendant's trial, after she said that she saw a man walk down South Monroe from Erie to East Porter past where she was watching from on her porch, Vandevender had the following exchange with the prosecutor:

*Q.* As he walked past you up to this direction, did you recognize him?

*A.* Yes.

*Q.* When did you recognize him?

*A.* I could—well, I wasn't sure if I got a good look at him until he got out to the end of the drive and I could see better there, because the light—the light was more brighter.

The "end of the drive" to which Vandevender was referring was the intersection of South Monroe and East Porter. Kagan-Kans took a series of measurements from Vandevender's porch to this intersection. Kagan-Kans determined that the distance from Vandevender's porch to where defendant was standing when Vandevender identified him was approximately 73 feet.

Kagan-Kans then took measurements of the brightness at the corner of South Monroe and East Porter after dark. Kagan-Kans used a light meter reading device, which measured brightness in "lux." Kagan-Kans measured the light directly under the light at South Monroe and East Porter—which he said was emitting a whiter, brighter light than other lights in the area—and the light meter registered 32.1 lux. He took another measurement while standing directly under a streetlight on Linden, which was emitting a duller orange-yellow light, and the light meter registered 15.7 lux.[5] He also took a light reading from approximately where Vandevender said defendant was standing when he was emptying the purse on the corner of South Monroe and East Porter, and the light meter registered one lux.

Kagan-Kans also took a series of photos. Some of the photos documented where he took the measurements from. Other photos depicted the area at night. In some of the photos depicting the area at night, Kagan-Kans stood near Vandevender's porch and photographed a colleague standing approximately where defendant would have been when Vandevender identified him. Kagan-Kans said that, as depicted in the photos, he could see that a person was standing on the street corner "but not much more detail than that"; he could not discern the facial features of that individual, including whether the person had facial hair.

Dr. Margaret Bull Kovera, an expert in eyewitness identification, was hired by defendant to form an opinion about this case. Kovera described Vandevender's eyewitness encounter with defendant as follows:

Ms. Vandevender reported seeing somebody walk down the street at night. That person got to the end of her street by a stop sign, was rifling through [the purse]. And it was at that point that she said she recognized the person that she saw as—as

---

[5] A former public safety officer testified that the light at South Monroe and East Porter was changed in 2019 from a sodium vaper light to an LED light, which "seem[ed] to be a little bit brighter." He clarified that not all the dimmer sodium vapor bulbs had been replaced.

Tyrone Kennedy. Again, basically, what he—what—the person who was there was dumping some materials into the river.

Kovera described the following as "key" factors to consider when assessing the reliability of an eyewitness identification:

> We tend to look at factors that affect encoding, storage, and retrieval of a memory. And in terms of encoding conditions, we're thinking about things like lighting and distance and the amount of time one's exposed to a face. We're also thinking about things like post-event information and things like that, that can happen. In terms of the retrieval, we think about what's going on with the police procedures in terms of lineup composition, instructions that are given, who's conducting the lineup, you know. Does the lineup administrator know who the suspect is? And things like that.

She described the process of encoding a memory as follows:

> In order to form a memory, you actually have to pay attention to something and to have enough information—sensory information reach your eyes and ears in order to be able to process that information in your brain to store up for later views. So, encoding is really based on one's ability to attend to and perceive detail of what you're trying to remember later.

According to Kovera, distance and lights affect a person's ability to encode memories:

> Well, not surprisingly, distance—the farther away somebody is, the harder it is to see them and it's also, you know—the farther away the harder it is to see details of the face and that's combined with the lighting conditions. And so, again, lower light makes it more difficult for the—eyes, basically, are viewing through light waves, and so if the light levels are low, there is no light waves reaching the retina that the witness will then be able to process that information and encode it into a memory.

Kovera explained that the "rule of 15" minimized mistaken identifications due to distance and light. That rule, according to Kovera, states that identifications that occur at no more than 15 meters (roughly 50 feet) at a brightness of no less than 15 lux will result in only one mistaken identification for every 15 correct identifications.

Kovera said that race also plays a role in encoding memories. She explained, "What we find is that witnesses are better able to encode faces of people who are of the same race as they are, and they do more poorly at recognizing faces from other racial or ethnic groups."

Kovera said that she had reviewed the materials for this case and was able to render a professional opinion about the reliability of Vandevender's eyewitness identification of defendant. She requested the measurements taken by Kagan-Kans to form her opinion. Consistent with Kagan-Kans measurements, Kovera opined that Vandevender identified defendant from approximately 21 meters (roughly 70 feet) away in one lux of brightness. At this distance, and under these lighting conditions, "[i]t would be very difficult, especially at one lux, but also at that

distance, to perceive any details about the face that would allow one to make reliable identifications," Kovera said. This is because "[i]f you have a very short exposure time to a face, then you're not going to be able to gather information to encode. And again, with less attention, you will have a weaker memory encoded." She added that the current scientific consensus is that witnesses tend to overestimate the amount of time they spent observing a suspect.

Kovera further opined that, on the basis of the photographs taken by Kagan-Kans from Vandevender's porch to the area where Vandevender testified that she observed defendant, "I don't think that a witness under these conditions could have seen anything about the perpetrators, or a target person's face, that would have allowed them to make an identification. There is—it's just too far and the lighting is too low."

Kovera also testified about problems with the conditions under which Vandevender identified defendant at the lineup. Kovera testified that Vandevender was never instructed that the perpetrator may not be in the lineup she was viewing, which was a best practice for reducing the risk of misidentification. Kovera further testified that

> [w]hen conducting—constructing a lineup and choosing fillers, the best practice is to make sure that the—the fillers all match the description that the witness gave of the suspect and to not have the suspect to stand out in any way. And the reason why this is desirable is that for the lineup to serve the test of witness memory, the witness should not be able to deduce or reason their way into choosing the suspect, as the suspect is the only one who matches the description that the witness gave. And so, that's the best practice, to match the description, and then to ensure that the suspect does not stand out from among the fillers.

Kovera opined that this best practice, first recognized in 1998, was not followed in the instant case. This is because, in the instant case, "only the suspect had facial hair and was short, which was part of the description given by Ms. Vandevender. The other fillers did not match this—these features, causing the suspect to stand out." These circumstances, according to Kovera, "could cause the witness to choose the suspect just, again, through deduction, rather than through a recognition process and recognition is memory and deduction is not. And so, it could—it could bias the witness toward choosing the suspect."

Kovera identified another best practice as blind administration of the lineup. By blind administration, Kovera meant the officer conducting the lineup is unaware who the suspect is. A nonblind administration could "cause witnesses to be more likely to identify the suspect than they would be if they—those lineups were conducted by a blind administrator." This is because research shows that

> people who just know who the suspect is emit cues, behavioral, nonverbal—either behavioral or nonverbal cues that communicate information to the witness about who to–who the suspect is and neither the person delivering those cues, nor the witness, necessarily knows that they are happening.

Kovera further noted that the amount of time taken by a witness when identifying a suspect in a lineup plays a role is determining the accuracy of the identification. She elaborated:

What we know is that there is a tendency for witnesses who are accurate to make their decisions very quickly. Again, if you think about the process of recognition, it really is this idea of having a sense of familiarity when you see a stimulus, and then recognizing it as if you have seen it before. So, if you are taking a longer period—and that's a very automatic process and it happens quickly. And if you are taking a long time to make a decision, it's more likely you're engaging in these kind—kind of deductive reasoning processes, as opposed to these—these quick recognition processes. So, there has been a—a variety of studies that have been done on this topic and they—they all suggest that identifications made more quickly are more likely to be accurate than those that are made more slowly.

Thus, the longer the witness takes to identify a suspect, the less likely the identification is. Accurate identifications usually occur within the first 36 seconds of the lineup, according to Kovera.

Kovera also noted that "unconscious transference" plays a role in the accuracy of identifications. Kovera explained the concept of unconscious transference as "the idea that sometimes the—we mistakenly think somebody we've seen in one context is somebody that we've seen in another." She said, "The problem is, is when witnesses come in and it's been a long time or the encoding wasn't particularly great and they see this person who was familiar to them, they misattribute that familiarity to that person being the perpetrator and not their familiarity with them from a different context." Thus, [i]f the witness had seen somebody around the neighborhood before, she could misremember–if that person was, then, in the lineup, she could misremember that person as being the suspect because of that feeling of familiarity from having seen them around."

Dr. Kovera concluded that, in this case, there were poor witnessing conditions given the lighting and the distance, and it was a cross-race identification. Vandevender's subsequent identifications of defendant suggested to Kovera that Vandevender had poor memory of the identification, which was compounded by poor procedures used during the police lineup. Dr. Kovera believed that, considering the totality of the conditions, this was one of the worst set of factors for an identification case that she had reviewed in her career.

During cross-examination, Dr. Kovera said that she did not recall witnesses at defendant's trial saying that the area where Vandevender recognized defendant was well lit.[6] She also admitted that she did not know what the lighting conditions on September 4, 1987 were like. Kovera said that she relied on the measurements of the area provided to her by the Innocence Project instead of relying on testimony from defendant's trial because she thought the testimony would be less reliable. When asked whether her opinion would change if the conditions of Vandevender's identification were brighter, Kovera said, "Probably not given the distance, because what's

---

[6] Besides Vandevender's testimony that the area was well lit, Carolyn described the area as "almost like daylight" at night, and Walter and Officer Rogers both said that the area was light enough to see clearly at night.

required is both light and distance being within those limits." She clarified, however, that if it was brighter, "it might not be the worst" conditions for identification that she had seen.

Kovera was also asked how her opinion would change if Vandevender had a longer opportunity to observe the suspect "as, perhaps, they walked down the street" in front of Vandevender's house. Kovera replied that, while it would be a closer distance, "the exposure time would not be that great," and Kovera "would also be concerned . . . about attention." This was because, according to Kovera, Vandevender only became suspicious when she saw the man "dumping material into the river, which he's doing at the end of the street. So, there would be no reason for her to be paying attention to his face prior to that." Kovera later agreed, however, that if someone in Vandevender's position was paying attention and the lighting was as Vandevender described, then they would "have a very good view" of a person walking in front of the home.

Kovera was also questioned further about the length of time a witness takes to make an identification in a lineup. It was noted that, sometimes, witnesses are asked to wait during a lineup while each person comes forward and turns to the left and right, and to only make an identification after viewing the entire lineup in this way. Kovera explained that the 36-second time concerned whether it was "an automatic recognition process," not necessarily a firm rule. Kovera said that she relied more on Vandevender's statements that she deliberated and took her time when identifying defendant, and less on the amount of time that Vandevender said it took to make the identification. But she nevertheless acknowledged that, had Vandevender received instructions to not make an identification until she had viewed the entire lineup, and had she followed those instructions, the identification would have taken longer.

## C. THE TRIAL COURT'S RULING

In a written opinion, the trial court denied defendant's motion for relief from judgment based on newly discovered evidence. The court began by addressing Etchison's testimony that Wilson confessed to the crime for which defendant was convicted. The court observed that Etchison "was quite candid about the fact that she was probably using narcotics" when Wilson confessed, and that "the alleged confession was made approximately 15 years after the assault in question." The court further observed that Wilson's statement to Etchison did not include any "specific information or facts that would convince" the court "of its reliability." The court lastly noted Etchison's testimony that she wanted to help defendant's family. All of this, the court opined, made Etchison's testimony lack credibility. The court also questioned whether Etchison's testimony would be admissible. In addition, the court noted that Wilson was identified as a possible co-defendant at the time of trial, so Wilson's potential involvement in the crime was not newly discovered evidence. The court concluded that "the testimony of the newly discovered witness would not create a reasonable probability of a different trial outcome in the instant case."

Turning to defendant's motion for relief from judgment based on new scientific evidence, the court observed that Kagan-Kans measurements were taken in 2019, "30 years after the event in question." This led the court to believe that the measurements did not "reliably demonstrate what the conditions were at the time Vandevender observed the person she identified as" defendant. The court emphasized the testimony of the witnesses at trial who all said that the area was well lit, and concluded, "It is pure speculation to assume that the conditions in 2019 reflect the conditions in 1987." The court acknowledged the testimony of the public safety officer about

the position of the street lights, but noted that, while important, "much of the ambient light in 1987 came from lights affixed to neighborhood homes and garages."

Turning to Kovera's opinion that the eyewitness identification in this case was unreliable, the court opined that a problem with Kovera's opinion was that it was rendered using "observations of the area in 2019, not at the time of the identification." The court also noted that Kovera's concerns about delay in Vandevender's identification at the lineup were due to directions that Vandevender received. The court further observed that Vandevender's testimony was not the only evidence of defendant's guilt; there was also defendant's admissions to Howard. The court summarized, "When looked at in its entirety, the admissions of [defendant], combined with the eye-witness statement and the supporting testimony about the lighting conditions at the time of the original identification, there is strong evidence that [defendant] was the perpetrator of the assault in question." The court contrasted this with Kovera's testimony, which the court found "informative, but not necessarily reliable due to the fact that much of her analysis of the initial identification is based upon the conditions as reported in 2019."

The court concluded that defendant's newly discovered evidence, to the extent that it was relevant and admissible, was "insufficient to make a different result probable on retrial when weighed against the testimony presented at trial."

## IV.  DEFENDANT'S APPEAL

On appeal, defendant contends that the trial court abused its discretion by denying his motion for relief from judgment based on newly discovered evidence.

### A.  STANDARD OF REVIEW

This Court reviews a trial court's decision on a motion for relief from judgment for an abuse of discretion. *People v Swain (On Remand)*, 288 Mich App 609, 628; 794 NW2d 92 (2010). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. at 628-629.

A trial court's factual findings underlying its ruling are reviewed for clear error. MCR 2.613(C). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014).

### B.  STANDARD FOR RELIEF FROM JUDGMENT BASED ON NEWLY DISCOVERED EVIDENCE

Motions for relief from criminal judgments are governed by MCR 6.500 *et seq*. MCR 6.508(D)(3) provides that a court may not grant relief to a defendant if the motion alleges grounds for relief that could have been previously raised on appeal. Etchison's testimony about her conversation with Wilson roughly 15 years after defendant's trial, as well as the scientific evidence concerning eyewitness identification, were not available to defendant at the time of his trial or appeal. It follows that claims based on this evidence could not have been raised on appeal by defendant because the pertinent events did not occur until well after defendant was convicted.

MCR 6.508(D)(3) therefore does not bar these newly discovered evidence claims. See *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018).

To obtain a new trial on the basis of newly discovered evidence, as defendant here seeks, a defendant must show that

> (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. [*People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (quotation marks and citations omitted).]

The dispute in this case largely centers on the fourth required showing—that defendant's new evidence would make a different result on retrial probable. As our Supreme Court explained in *Johnson*, 502 Mich at 566-567:

> In order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible. [*Cress*, 468 Mich] at 692-693. In making this assessment, the trial court should consider all relevant factors tending to either bolster or diminish the veracity of the witness's testimony. See *id*. at 692-694. A trial court's function is limited when reviewing newly discovered evidence, as it is not the ultimate fact-finder; should a trial court grant a motion for relief from judgment, the case would be remanded for *retrial*, not dismissal. In other words, a trial court's credibility determination is concerned with whether a *reasonable juror* could find the testimony credible on retrial.

The *Johnson* Court elaborated:

> If a witness's lack of credibility is such that *no* reasonable juror would consciously entertain a reasonable belief in the witness's veracity, then the trial court should deny a defendant's motion for relief from judgment. However, if a witness is not patently incredible, a trial court's credibility determination must bear in mind what a reasonable juror might make of the testimony, and not what the trial court itself might decide, were it the ultimate fact-finder. [*Id*. at 568.]

If a trial court concludes that a reasonable juror could have found the witness providing the new evidence to be credible, the court

> must consider the evidence that was previously introduced at trial. *Cress*, 468 Mich at 692; see also *People v Grissom*, 492 Mich 296, 321; 821 NW2d 50 (2012) (ordering "the trial court [on remand to] carefully consider the newly discovered evidence *in light of the evidence presented at trial*") (emphasis added). The trial court must also consider the evidence that would be admitted at retrial . . . . *Cress* specifically uses the term "retrial," which refers to a new trial. Thus, the evidence that must be taken into consideration when assessing a claim of newly discovered evidence is not simply the evidence presented at the original trial, but also the evidence that would be presented at a new trial. *Cress*, 468 Mich at 694 ("[The

confessor's] testimony (even presuming he would testify at a *new trial*) would not make a different result probable retrial.") (emphasis added). [*Johnson*, 502 Mich at 571-572.]

## C. WILSON'S CONFESSION

Etchison testified that Wilson told her sometime between 2001 and 2004 that defendant was not involved in the robbery and assault of Watson. Wilson then admitted to Etchison that he and another individual, whom he did not identify, broke into Watson's home, hit her in the head with a brick, and took money that he used to pay a drug debt.

The trial court found that Etchison's testimony lacked credibility because she candidly admitted that she was using drugs at the time Wilson allegedly confessed and because Wilson's statement to Etchison, as reported by Etchison, lacked details that someone who committed the offenses would have known. The court's reasoning makes no mention of Etchison's report that she and Wilson were of clear minds at the time of disclosure. But the court's credibility determination suggests that the court found Etchison's candid admission of controlled substance use more credible than her claim of a clear mind. Because the trial court heard Etchison's testimony and had the opportunity to observe the witness's demeanor, this credibility assessment is entitled to deference. See *People v McSwain*, 259 Mich App 654, 683; 676 NW2d 236 (2003). While Etchison noted that Wilson reported striking Watson with a brick, and although this statement is consistent with the evidence at trial, the trial court correctly observed that the alleged confession was made 14 to 17 years after the crime and after the facts of the crime had become public knowledge. The reference to the use of the brick thus does not suggest that Wilson disclosed facts to Etchison that would only have been known to someone involved in the commission of the conviction offenses.

The trial court also correctly noted that little if anything in the substance of Etchison's testimony was new; the record contains evidence that Wilson admitted to participating in the conviction offenses before defendant's trial, as well as evidence that Wilson later denied defendant's involvement in the offenses before defendant's trial. Wilson gave a statement to police wherein he admitted to aiding defendant in the crime, stating:

> On . . . Friday, Sept 4, 1987 around 9:30pm Me and Tyrone Kennedy went up to the corner (600 Blk Austin Ave.) to do some gambling behind the restaurant. Tyrone got in a game and lost about $50.00 in weed in the game. We left the game and tyrone [sic] said lets [sic] go down town [sic] and see what we can get into. We then started walking down town [sic] and he said he knew this old lady that he could get some money from. We then walked in behind the bank. He asked if I wanted involved [sic] because he was going to make a[] hit at this old lady's house. I told him no because I was already on probation and did not want anymore trouble. We then went down to Erie St. and then down to the street by the river. I then told him to go ahead and I would watch out for him. He then left down the street and I waited on the . . . sidewalk by the bridge. I waited about 20 Minutes [sic] and thought something was wrong so I went across the street to the alley and went to the Goodrich Club. I started talking to Mike Root and . . . five minutes later tyrone [sic] came back and called me outside. He was breathing hard like he had been

-13-

running. He said man I got the money I got about $200.00. I then told him I am already on probation and I can't deal with . . . this I then left and went home. I actually seen Tyrone with about $70.00 or $80.00 but not the $200.00. Tyrone did mention that he owed a man some money . . . for drugs and had to score.

The record also contains evidence that Wilson provided "physiological responses" during a December 8, 1987 polygraph examination indicating that Wilson was being deceptive when he denied participating in the conviction offenses. This same report also suggests that defendant identified Wilson as his accomplice. Finally, there is evidence that Wilson eventually recanted his statements incriminating defendant, and said that defendant "did not do it." Considering all this, Wilson admitting that he and a third person, whom he did not identify, committed the conviction offenses—and that defendant did not—would not qualify his confession as new evidence.

For these reasons, we discern no error in the trial court's assessment of Etchison's testimony.

## D. EYEWITNESS IDENTIFICATION

Defense witness Kagan-Kans presented demonstrative evidence in the form of measurements of distance and illumination, as well as photographs. Defense expert Kovera relied on this demonstrative evidence, primarily the measurements but also the photographs to a lesser degree, to form an expert opinion regarding the reliability of Vandevender's eyewitness identification of defendant.

"Demonstrative evidence is admissible when it aids the fact-finder in reaching a conclusion on a matter that is material to the case." *People v Bulmer*, 256 Mich App 33, 35; 662 NW2d 117 (2003). Demonstrative evidence must be relevant and probative to be admissible. *People v Unger*, 278 Mich App 210, 247; 749 NW2d 272 (2008). When demonstrative evidence "is offered not in an effort to recreate an event, but as an aid to illustrate an expert's testimony regarding issues related to the event, there need not be an exact replication of the circumstances of the event." *Bulmer*, 256 Mich App at 35. In other words,

[w]hen evidence is offered to show how an event occurred, the focus is upon the conditions surrounding that event. [*Green v General Motors Corp*, 104 Mich App 447, 450, 304 NW2d 600 (1981).] Consequently, it is appropriate that those conditions be faithfully replicated. *Id*. By contrast, when the evidence is being offered not to re-create a specific event, but as an aid to illustrate an expert's testimony concerning issues associated with the event, then there need not be as exacting a replication of the circumstances of the event. *Id*. [*Lopez v General Motors Corp*, 224 Mich App 618, 628 n 13; 569 NW2d 861 (1997).]

Kovera relied on the measurements taken by Kagan-Kans to determine that Vandevender's identification of defendant was made at one lux of light from approximately 21 meters away. Kovera opined that these circumstances were inhospitable to encoding into memory a reliable identification of the person seen rifling through Watson's purse. Kovera's opinion testimony establishes that she "focus[ed] upon the conditions surrounding that event" and relied on those circumstances "to show how an event occurred." *Lopez*, 224 Mich App at 628 n 13. Stated another

way, she relied on the demonstrative evidence to recreate an event—Vandevender's observation of the suspect. *Id*. The trial court determined, however, that Kovera's reliance on the illumination measurements taken by Kagan-Kans in 2019 undermined the credibility and usefulness of her expert testimony.

Kagan-Kans sought to recreate the conditions of Vandevender's identification of defendant shortly after 11 p.m. on September 4, 1987. To do this, Kagan-Kans collected measurements of illumination levels after 8 p.m. on an early October 2019 evening. Circumstances that affect illumination levels are dynamic; they change over time. For example, a public safety officer testified that the street light located at the intersection of South Monroe and East Porter had been changed in 2019 from a sodium vaper light to an LED light, which provided brighter illumination. The parties also agree that there was trial testimony about a light on a garage on South Monroe that resembled the lights used by farmers to illuminate the areas about their homes and outbuildings that was providing some degree of illumination in the area. Kagan-Kans had no memory of any such light being on when he was measuring illumination and taking photographs. There was additional testimony that another street light had been moved since September 4, 1987, and Vandevender testified that there was another bright "farmer type" light on a garage on the other side of the millrace. There was no testimony explaining how these sources of light were accounted for, or why they were not accounted for.

Under these circumstances, there was clearly no attempt to faithfully replicate the illumination present on September 4, 1987, before Kagan-Kans took his illumination measurements and photographs. The illumination measurements and photographs thus have little probative value concerning the actual conditions surrounding Vandevender's identification of defendant. The trial court did not err by concluding that Kovera's reliance on this information rendered her expert opinion regarding the reliability of Vandevender's identification of defendant largely unhelpful to the trier of fact.

During cross-examination, Kovera acknowledged that she did not know what the actual lighting conditions were on September 4, 1987. She nevertheless opined that, even if the conditions in 1987 were brighter than they were in 2019, her opinion about the reliability of Vandevender's identification would not change because Vandevender was just too far away from the individual to make an accurate identification. But Kovera's testimony demonstrated that this conclusion ignored the actual events leading to Vandevender's identification of defendant on September 4, 1987.

On the night of September 4, 1987, Vandevender was babysitting a child, whose mother lived across the street from Vandevender. The mother told Vandevender that she would be home around 11 p.m. As 11 p.m. neared, Vandevender stepped onto her front porch to watch for the mother, who would be returning home on foot. While waiting, Vandevender watched a man cross Erie street and turn down South Monroe towards Vandevender's house. Vandevender took notice of the man because he was carrying a large purse under his arm. Vandevender watched as the man walked past the front of her house to the intersection of South Monroe and East Porter, where he stopped, rifled through the purse, put something into his pocket, and threw the purse into the nearby river. Vandevender affirmed that she recognized the man "[a]s he walked past [her]," and said that she "wasn't sure if [she] got a good look at him" until he reached the "end of the drive" where the light was brighter. Vandevender said that she watched the neighborhood frequently because

she was trying to start a neighborhood watch, and that she recognized the man as someone she had seen walking around the neighborhood. She told this to the officers that responded to the scene. One of those officers testified that he knew defendant and had seen him walking around the area near Vandevender's home.

Kovera's expert opinion failed to consider Vandevender's testimony about her observations occurring before the individual stopped and rifled through the purse. Kovera admitted that Vandevender would have been closer when he walked by her house, but Kovera said that she "would be concerned . . . about attention" because, according to Kovera, Vandevender only started paying attention to the man walking down the street on September 4, 1987, when she saw the man "dumping material into the river, which he's doing at the end of the street." But Vandevender testified that she was paying attention to the man while he was walking by her house because he was carrying a large purse under his arm. Kovera agreed that if someone in Vandevender's position was paying attention and the lighting was as Vandevender described, then they would "have a very good view" of a person walking in front of the home. These considerations largely undermine Kovera's expert opinion regarding the reliability of Vandevender's identification predicated solely on distance.

For these reasons, we discern no error in the trial court's finding that Kovera's testimony was "not necessarily reliable."

## E. WHETHER NEW EVIDENCE MAKES A DIFFERENT RESULT PROBABLE

Based on the trial court's proper findings, it did not abuse its discretion by concluding that defendant's new evidence would not make a different result probable upon retrial.

The new evidence presented at the evidentiary hearing, as recounted above, consisted of Etchinson's testimony about Wilson's confessions, Kagan-Kans' demonstrative evidence, and Kovera's expert opinion about the reliability of Vandevender's identification. Consistent with Justice CAVANAGH's concurrence, we will also consider the evidence supporting defendant's ineffective assistance claim and the alleged *Brady* violation.

Turning first to defendant's ineffective assistance claim, the evidence supporting that claim is redundant to the evidence supporting his claim based on newly discovered evidence. Defendant argued that his trial and appellate counsel were ineffective for failing to investigate and present evidence about the distance and lighting conditions surrounding Vandevender's identification of defendant. The evidence supporting this claim is Kagan-Kans' measurements and Kovera's testimony about whether Vandevender would have been able to identify defendant under conditions consistent with Kagan-Kans' measurements. Therefore, reviewing this claim as part of looking at what evidence would be admitted at retrial, see *Johnson*, 502 Mich at 571, there is no additional evidence to consider.

There is additional evidence that defendant submitted in support of the alleged *Brady* violation, however. Defendant offered into evidence a "note" prepared by someone in the prosecutor's office, the text of which reads:

> "Hazel [Vandevender] says she has to talk to Jerry. She doesn't want to testify until she clears something up about what she can see from her house. You may wish to talk to her since Jerry's tied up.

No one provided any context or explanation for this note. Kagan-Kans testified that he asked the original prosecutor about the note, and the prosecutor said that he did not recall anything about it. The prosecutor said that "Jerry," an investigator in the prosecutor's office, is deceased. The note was allegedly written by the witness coordinator in the prosecutor's office, but the defense did not attempt to reach him. It is thus unclear what prompted the note or what was done as a result of the note.

Defendant characterizes the content of this note as showing that Vandevender doubted the reliability of her identification testimony. But the language of the note itself does not call into question Vandevender's confidence in her identification. At best, the note reflects Vandevender's desire to discuss her upcoming testimony with the prosecutor. What concerns she had, if any, are not disclosed. The note lacks the specificity necessary to support a reasonable inference that Vandevender was second-guessing her identification of defendant. Defendant's conclusion to the contrary is pure speculation.

To summarize, defendant's new evidence that would be admitted at retrial would consist of (1) the note from the prosecutor's office, (2) Etchison's testimony about Wilson's confessions, and (3) Kovera's expert opinion about the reliability of Vandevender's identification based primarily on Kagan-Kans' measurements.

The trial court properly considered whether this new evidence would make a different result probable on retrial by considering this evidence in conjunction with the evidence that was previously introduced at trial. See *Johnson*, 502 Mich at 571. The trial court highlighted defendant's admissions to Howard, Vandevender's account of the identification, and "the supporting testimony about the lighting conditions at the time of the original identification." To reiterate, every witness who testified about the lighting conditions at South Monroe and East Porter on September 4, 1987, said that it was bright and that they could see clearly. Vandevender testified that there was a light on the corner of Erie and South Monroe, as well as a bright garage light on South Monroe next to her house. She said that she watched a man carrying a purse under his arm walk down Erie, turn down South Monroe, then stop at the corner of South Monroe and East Porter to rifle through the purse. Vandevender continued to watch as the man placed something in his pocket, put the rest of the contents back in the purse, walked into the middle of South Monroe, and threw the purse into the millrace. She saw the contents of the purse fall out in the air, and some of those contents were later recovered. Vandevender affirmed that she recognized the man "[a]s he walked past [her]," and said that she "wasn't sure if [she] got a good look at him" until he reached the intersection of South Monroe and East Porter where the light was brighter. She said that she recognized the man as someone that she had seen walking around the neighborhood, and she told this to the officers that responded to the emergency call that night. One of the officers testified that he knew defendant and that he had seen defendant walking near the area of Vandevender's house. Finally, Howard testified that defendant told him that defendant and Wilson went to Watson's house to steal from her, that defendant "was drunk and lost control of himself and was afraid [Watson] would identify him in a line-up," and that defendant said he took Watson's purse

-17-

and later "tossed" it. Based on the foregoing, we agree with the trial court that "there is strong evidence that [defendant] was the perpetrator of the assault in question."

The prosecutor's note would be minimally helpful against this evidence because it only indicated that Vandevender wished to discuss her upcoming testimony with the prosecutor. Etchison's testimony would likewise be minimally helpful because, as the trial court found, Etchison lacked credibility, and little if any of the substance of her testimony was new. Lastly, Kovera's expert testimony about the reliability of Vandevender's identification of defendant would be largely unhelpful to the trier of fact for the reasons explained above.

On this record, the trial court's conclusion that the "relevant and admissible evidence is insufficient to make a different result probable on retrial when weighed against the testimony presented at trial" was not outside the range of reasonable and principled outcomes. Accordingly, the trial court did not abuse its discretion by denying defendant's motion for relief from judgment.

Affirmed.

/s/ Kathleen Jansen
/s/ Colleen A. O'Brien